IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|   |   |
|---|---|
| ASSET RECOVERY ASSOCIATES, LLC as assignee for the benefit of creditors for AtlantaFresh Artisan Creamery, LLC,<br><br>Plaintiff,<br><br>v.<br><br>WHOLE FOODS MARKET GROUP, INC., et al.,<br><br>Defendants. | CIVIL ACTION FILE<br>NO. 1:21-CV-2629-TWT |

### OPINION AND ORDER

This is a breach of contract action. It is before the Court on Defendants Whole Foods Market Group, Inc. and Whole Foods Market Rocky Mountain/Southwest, LP's Motion for Summary Judgment [Doc. 19]. For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants Whole Foods Market Group, Inc. and Whole Foods Market Rocky Mountain/Southwest, LP's Motion for Summary Judgment [Doc. 19].

### I. Background

This case arises out of the alleged breach of a supply contract (the "Supplier Agreement" or "Agreement") between AtlantaFresh Artisan Creamery, LLC ("AtlantaFresh"), on the one hand, and Defendants Whole

Foods Market Group, Inc. ("WFM Group") and Whole Foods Market Rocky Mountain/Southwest, LP ("WFM Rocky Mountain") (collectively, the "WFM Defendants"), on the other hand. AtlantaFresh was a small authentic Greek-style yogurt manufacturer with its principal place of business in Norcross, Georgia. (Am. Compl. ¶¶ 12-13.) WFM Group and its affiliate WFM Rocky Mountain are Texas-based businesses that operate an international chain of high-end grocery stores called Whole Foods Market ("Whole Foods"). (*Id.* ¶ 14.) On March 18, 2011, AtlantaFresh and WFM Group entered into the Supplier Agreement whereby WFM Group agreed to enroll AtlantaFresh in the Local Producer Loan Program and slot its products in all Atlanta-area Whole Foods stores. (Supplier Agreement, Ex. A.)[1] The parties executed an amendment to the Agreement on or about September 1, 2015, (the "First Amendment") which, among other things, added WFM Rocky Mountain as a contract counterparty. (WFM Defs.' Statement of Undisputed Material Facts ¶ 2.)

In a letter dated September 5, 2017, Ron Marks, the president and owner of AtlantaFresh, received notice that the WFM Defendants were terminating the Supplier Agreement "effective immediately." (Pl.'s Statement of Additional Undisputed Material Facts ¶ 17.)[2] The letter does not cite a

---

[1] The Supplier Agreement and all amendments and exhibits thereto are filed under seal at Doc. 22.

[2] The WFM Defendants have failed to respond to the Plaintiff's Statement of Additional Undisputed Material Facts, in violation of Local Rule 56.1(B)(3). LR 56.1(B)(3), NDGa ("If respondent provides a statement of

contractual failure or breach by AtlantaFresh or any other ground for termination. (*Id.* ¶ 18.) Rather, the WFM Defendants contend that paragraph 12 of the Supplier Agreement gives them the right to end their arrangement with AtlantaFresh without cause. (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 14-15.) Paragraph 12, entitled "Miscellaneous," states in relevant part:

> This agreement shall be effective as of the date of execution by Supplier and shall continue in effect with respect to all Products purchased or ordered by WFM from Supplier prior to the receipt of written notice of its revocation by WFM.

(WFM Defs.' Statement of Undisputed Material Facts ¶ 3.) Per paragraph 3 of the First Amendment, "[o]ther than as set forth in this First Amendment, all of the remaining terms and conditions of the Agreement shall continue in full force and effect." (*Id.* ¶ 5.)

After the termination of the Supplier Agreement, AtlantaFresh was forced to lay off its 32 employees and go out of business. (Am. Compl. ¶ 4.) As part of this process, AtlantaFresh executed a Deed of Assignment purporting to assign all of its assets to the Plaintiff Asset Recovery Associates, LLC for the

---

additional material facts, then, within the time allowed for filing a reply, the movant *shall* file a response to each of the respondent's facts.") (emphasis added). The Court interprets the WFM Defendants' silence as a concession that the Plaintiff's material facts are true, so long as those facts are supported by evidentiary citations, do not involve legal conclusions, and are not contradicted in the WFM Defendants' Statement of Undisputed Material Facts. *See Smith v. MTI Limo & Shuttle, Inc.*, 2011 WL 13272825, at *2 (N.D. Ga. Sept. 12, 2011).

benefit of creditors. (WFM Defs.' Statement of Undisputed Material Fact ¶ 7.) The Plaintiff and the WFM Defendants dispute whether the Deed of Assignment is qualified by an earlier Professional Services Agreement between the same parties. (Pl.'s Resp. to WFM Defs.' Statement of Undisputed Material Facts ¶ 8.) The WFM Defendants claim, and the Plaintiff denies, that "AtlantaFresh retained significant rights and control over its business affairs" under the Professional Services Agreement, and that "nothing in the Deed of Assignment terminates the pre-existing Professional Services Agreement." (*Id.* ¶¶ 9-10.) Now, in moving for summary judgment, the WFM Defendants ask the Court to determine whether the Deed of Assignment is valid and enforceable under Georgia law, and whether they have a right to terminate the Supplier Agreement at any time in their sole discretion.

## II.   Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative

evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

### III. Discussion

### A. Validity of the Deed of Assignment

The WFM Defendants raise two grounds for summary judgment as to all of the claims against them. They contend that the Plaintiff is not a "bona fide" assignee—and thus lacks standing to enforce the Supplier Agreement—because (1) the Deed of Assignment failed to assign all of AtlantaFresh's property and rights to the Plaintiff, and (2) Georgia law does not authorize a limited liability company ("LLC") like AtlantaFresh to make an assignment for the benefit of creditors. (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 5-6.) The Court addresses each argument in turn.

### i. Whether the Deed of Assignment Assigned All of AtlantaFresh's Property and Rights to the Plaintiff

In Georgia, a valid assignment for the benefit of creditors must convey "all of the property of every sort which is claimed or owned by the assignor at the time of the execution thereof," O.C.G.A. § 18-2-44(a), and "[t]he assignee shall succeed to all rights of the assignor[.]" *Id.* § 18-2-54. According to the WFM Defendants, the Deed of Assignment does not meet these criteria because AtlantaFresh retained significant rights and control over its business affairs under the Professional Services Agreement. (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 5.) Dated April 20, 2018, the Professional Services

5

Agreement called for the Plaintiff to provide consulting, advisory, and financing services to AtlantaFresh related to liquidating and closing the company. (Stine Decl., Ex. 2 at 3, 5.) In relevant part, the document identifies the Plaintiff as an independent contractor of AtlantaFresh, subjects the Plaintiff to the sole control of the AtlantaFresh Board, sets out the compensation schedule for the Plaintiff's services, and entitles AtlantaFresh to terminate the engagement at any time. (Stine Decl., Ex. 2 at 3.) The WFM Defendants contend that these contractual terms "cannot be reconciled with an assignor's unqualified assignment of its assets to an assignee," as required by Georgia law. (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 5 (emphasis omitted).)

Curiously, the WFM Defendants fail to cite any part of the actual, allegedly void Deed of Assignment in arguing about the significance of the Professional Services Agreement. The Court, however, has reviewed the Deed of Assignment and agrees with the Plaintiff that it complies with O.C.G.A. §§ 18-2-44(a) and 18-2-54. The Deed of Assignment, which was made almost three weeks after the Professional Services Agreement, states that AtlantaFresh

- "grants, assigns, conveys, transfers, and sets over unto the Assignee . . . all of its assets," including all "contracts, claims and demands . . . [and] choses in action";
- "appoints the Assignee its true and lawful attorney, irrevocable, with full power and authority to do all acts and things which may be necessary to execute the assignment hereby created"; and

6

- "authorizes the Assignee . . . to sign the name of the Assignor to any instrument in writing, whenever it shall be necessary to carry out the purposes of this assignment."

(WFM Defs.' Statement of Undisputed Material Facts, Ex. 2 at 2-4.) Moreover, it grants the Plaintiff "all rights and powers available under Georgia law, including O.C.G.A. § 11-9-309 and *O.C.G.A. § 18-2-54*." (*Id.* at 5 (emphasis added).) Accordingly, the Deed of Assignment properly transferred any and all rights or control that AtlantaFresh had previously retained over its assets and business operations to the Plaintiff.

### ii. Whether AtlantaFresh, as an LLC, Was Allowed to Enter into the Deed of Assignment

Next, Georgia law permits "[a]ny corporation, not municipal," as well as "persons and firms" to make assignments for the benefit of creditors.[3] O.C.G.A. §§ 18-2-41, -42. Because LLCs are not included in the "literal language" of these provisions, the WFM Defendants argue that AtlantaFresh did not have authority to execute the Deed of Assignment with the Plaintiff. (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 13.) However, as the Plaintiff

---

[3] The WFM Defendants question whether persons and firms have the same assignment powers as corporations since O.C.G.A. § 18-2-42, unlike O.C.G.A. § 18-2-41, does not include the language "for the benefit of creditors." (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 6 n.12.) However, O.C.G.A. § 18-2-42 appears in the same article of the Georgia Code as O.C.G.A. 18-2-41 entitled "Preferences and Assignments *for the Benefit of Creditors*." Absent any authority to the contrary, the Court interprets the term "assignment" in both provisions to have the same meaning: that is, for the benefit of creditors.

points out, the Georgia Limited Liability Act ("Georgia LLC Act") grants each LLC formed in this state "the same powers as any person has to do all things necessary to carry out its purpose, business, and affairs." O.C.G.A. § 14-11-202. The statute defines a "person" as, among other things, "an individual, business entity . . . or any other legal or commercial entity," while a "business entity" is further defined as "a[n] [LLC] . . . a general partnership, a corporation, or a foreign corporation." *Id.* §§ 14-11-101(2), (19). Courts in Georgia and other states have interpreted O.C.G.A. § 14-11-202 to mean what it says: that LLCs possess "the same powers as other persons (including individuals and other business entities)[.]" *Infinite Energy, Inc. v. Marietta Nat. Gas, LLC*, 349 Ga. App. 343, 347 (2019); *see also Nelson v. Alliance Hosp. Mgmt., LLC*, 2012 WL 2582343, at *4 (N.C. Super. Ct. July 3, 2012) (holding a Georgia LLC is authorized to sue in its own name rather than its owner's name).

The WFM Defendants urge the Court to adopt a narrow reading of the Georgia LLC Act. They claim that the "same powers" language in O.C.G.A. § 14-11-202 "is intended merely as a general grant of power" but "does not inject LLCs into unrelated statutes that grant powers to particular entities." (Reply Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 14-15.) This argument, though, conflicts with the interpretive maxim that "[t]he legislature is presumed to know the condition of the law and to enact statutes with reference to it." *State v. Tiraboschi*, 269 Ga. 812, 813 (1998). The Georgia LLC Act was enacted almost a century after the current assignment statutes; therefore, the

8

General Assembly, in clothing LLCs with the same powers as individuals, partnerships, and corporations, was aware that LLCs would then be able to make assignments. In fact, other sections of the Georgia LLC Act expressly recognize that "a[n] [LLC] interest is assignable in whole or in part[.]" O.C.G.A. § 14-11-502(1); *see also id.* §§ 14-11-503, -601.1 (designating procedures to admit or remove LLC members following assignment of their interests). For these reasons, the Court denies the WFM Defendants' Motion for Summary Judgment based on the validity of the Deed of Assignment.

### B.  Right to Terminate the Supplier Agreement Without Cause

In the alternative, the WFM Defendants move for summary judgment as to Count II of the Amended Complaint, which alleges that the WFM Defendants breached the Supplier Agreement in failing to purchase minimum products over the full contract term. (Am. Compl. ¶¶ 57-61.) According to the WFM Defendants, under paragraph 12 of the Agreement, they have "an unfettered right to end the business relationship with AtlantaFresh upon notice." (WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 14-15.) Paragraph 12 states that "[t]his agreement shall be effective as of the date of execution by Supplier and shall continue in effect with respect to all Products purchased or ordered by WFM from Supplier prior to the receipt of written notice of its revocation by WFM." (Supplier Agreement ¶ 12.) The WFM Defendants ask the Court to give the term "revocation" the same meaning as "termination" in the Texas Uniform Commercial Code ("UCC"). (WFM Defs.'

9

Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 18.) This construction, they argue, accords with the First Amendment to the Supplier Agreement, which explicitly references an early termination by the WFM Defendants. (*Id.* at 21.)

As a threshold matter, the Court must determine whether these arguments are foreclosed by the fact that they were previously made to and rejected by the Gwinnett County Superior Court. (*See* Pl.'s Br. in Opp'n to WFM Defs.' Mot. for Summ. J., at 3-4.) It is true that "[a]ll injunctions, orders, and other proceedings had in [an] action prior to its removal shall remain in full force and effect until dissolved by the district court." 28 U.S.C. § 1450. Nonetheless, "[a]fter removal, state court proceedings are treated as those of the district court, and the district court naturally is able to reexamine its own proceedings." *Jackson v. American Sav. Mortg. Corp*, 924 F.2d 195, 198 (11th Cir. 1991) (citation omitted). Here, the WFM Defendants moved to dismiss this case in state court, prior to removal, in part based on an identical interpretation of paragraph 12. (*Compare* WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 14-23, *with* Pl.'s Br. in Opp'n to WFM Defs.' Mot. for Summ. J., Ex. A at 2-11.) Although the court denied the motion as to the Plaintiff's breach of contract claims, its analysis consisted of just two conclusory sentences with no discussion at all of the WFM Defendant's termination arguments [Doc. 9 at 3]. The Court thus deems it appropriate to examine this question anew.

The construction of the Supplier Agreement is controlled by Texas law

pursuant to a contractual choice-of-law provision. (Supplier Agreement ¶ 11.) Under Texas law, "[w]hen a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). "Objective manifestations of intent control," and courts "interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* at 763-64 (quotation marks and citation omitted). Oftentimes, words "cannot be assigned a rigid meaning, inherent in themselves," but rather, "their meaning turns upon use, adaptation and context as they are employed to fit various and varying situations." *Id.* at 764 (citation omitted). To that end, "courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *RPC, Inc. v. CTMI, LLC*, 606 S.W.3d 469, 483 (Tex. Ct. App. 2020) (citation omitted) (emphasis in original). When a contract's meaning is uncertain and doubtful or reasonably susceptible to more than one interpretation, the jury is tasked with resolving the ambiguity through the use of extraneous evidence, as necessary. *Id.* at 484.

At issue here is the meaning of the term "revocation" in paragraph 12 of the Supplier Agreement. Because "revocation" is not defined in the Agreement or the Texas UCC, the WFM Defendants ask the Court to use the Texas UCC definition of "termination" as a gap filler. Under Tex. Bus. & Com. Code Ann. § 2.106(c), "'termination' occurs when either party pursuant to a power created

11

by agreement or law puts an end to the contract otherwise than for its breach." However, in attempting to draw a connection between "revocation" and "termination," the WFM Defendants spin a convoluted definitional web that tends to distort rather than elucidate the meaning of "revocation." (*See* WFM Defs.' Br. in Supp. of WFM Defs.' Mot. for Summ. J., at 18-20.) For example, Black's Law Dictionary defines "revocation" in the contract context as "[w]ithdrawal of an offer by the offeror" and more generally as "[a]n annulment, *cancellation*, or reversal, usu. of an act or power." *Revocation*, Black's Law Dictionary (11th ed. 2019) (emphasis added). The Texas UCC further describes "cancellation" as a party's election to "put[] an end to the contract *for breach* by the other[.]" Tex. Bus. & Com. Code Ann. § 2.106(d) (emphasis added). Obviously, none of these alternative definitions would support a unilateral right to terminate a contract at any time without cause.

Despite this inartful word choice, the Court finds that the context of paragraph 12 and the First Amendment to the Supplier Agreement support the WFM Defendants' reading of "revocation." Paragraph 12 provides that "this agreement . . . shall continue in effect . . . prior to the receipt of written notice of its revocation by WFM." (Supplier Agreement ¶ 12.) In other words, "revocation" refers to the act of taking the entire Supplier Agreement out of effect, not to some lesser act of withdrawing a contract offer, cancelling a

12

purchase order, or rejecting a nonconforming product.[4] Nor does paragraph 12 contemplate breach as a prerequisite to the WFM Defendants exercising their revocation right. The only limitation on this right is that all products purchased or ordered by the WFM Defendants prior to revocation remain subject to the Agreement. (*Id.*) The First Amendment confirms the Court's construction of paragraph 12 by making an express reference to termination without cause. Specifically, Exhibit B states that, "[i]f WFM *terminates* the Agreement *without cause*," AtlantaFresh is entitled to certain financial protections such as the release of any amount remaining on its promissory note to the WFM Defendants. (First Amendment, Ex. B ¶ 3 (emphasis added).)

In response, the Plaintiff do not put forth any plausible, opposing interpretation of paragraph 12 or the term "revocation"; instead, it argues that the First Amendment modified the Supplier Agreement with a definite term and minimum purchase amounts, subject to the sole condition that "the milk is from 100% grass fed and non-GMO fed animals[.]" (Pl.'s Br. in Opp'n to WFM Defs.' Mot. for Summ. J., at 9 (quoting First Amendment to Supplier Agreement, Ex. B ¶ 2.) According to the Plaintiff, had the parties meant to build in an unfettered right to terminate on simple notice, they could have

---

[4] Indeed, paragraph 5 of the Agreement separately outlines the conditions under which the WFM Defendants may terminate outstanding purchase orders or revoke acceptance of nonconforming products. (Supplier Agreement ¶ 5.)

inserted clear language to that effect in the First Amendment. (*Id.* at 12.) But that is precisely what the parties did in Exhibit B: notwithstanding the seven-year contract term and the minimum weekly purchase amounts, paragraph 3 acknowledges that the WFM Defendants can "terminate[] the Agreement without cause," and requires the WFM Defendants to reimburse some of AtlantaFresh's termination-related expenses. (First Amendment, Ex. B ¶ 3.) The Plaintiff's failure to address this provision at all is fatal to its construction of the Supplier Agreement. Therefore, the Court grants the WFM Defendants' Motion for Summary Judgment as to Count II of the Amended Complaint.

## IV.   Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants Whole Foods Market Group, Inc. and Whole Foods Market Rocky Mountain/Southwest, LP's Motion for Summary Judgment [Doc. 19].

SO ORDERED, this \_\_\_15th\_\_\_ day of March, 2022.

*Thomas W. Thrash*
THOMAS W. THRASH, JR.
United States District Judge

14